# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2705
_____

Casey Voigt; Julie Voigt

*Plaintiffs - Appellants*

v.

Coyote Creek Mining Company, LLC, a North Dakota Corporation

*Defendant - Appellee*

------------------------------

State of North Dakota; Lignite Energy Council

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the District of North Dakota - Bismarck
_____

Submitted: October 17, 2019
Filed: November 20, 2020
_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Casey and Julie Voigt, the owners of a large ranch in rural North Dakota, filed suit against Coyote Creek Mining Company, LLC (CCMC), alleging CCMC failed to

obtain the proper construction permit under the Clean Air Act (CAA), 42 U.S.C. § 7401, et seq., and failed to implement the requisite dust control plan for the Coyote Creek Mine, which is adjacent to the Voigts' ranch. CCMC moved for summary judgment on the Voigts' claims and the Voigts moved for partial summary judgment on issues of liability. The district court[1] granted summary judgment in favor of CCMC, concluding the federal regulations imposing permitting and dust control requirements do not apply to CCMC's operations. The Voigts appeal, arguing the district court erroneously determined the regulations are ambiguous and improperly relied on the North Dakota Department of Health (NDDOH) permitting decision to reach its conclusion. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Pursuant to the CAA, the Environmental Protection Agency (EPA) established National Ambient Air Quality Standards (NAAQS), which are designed to improve air quality by placing limits on six specific air pollutants, including, as relevant here, particulate matter. 42 U.S.C. §§ 7408-09; see also Util. Air Regulatory Grp. v. EPA, 573 U.S. 302, 308 (2014). Particulate matter is the air pollutant most commonly associated with mining operations. Areas of the country where the air quality meets the NAAQS are called attainment areas, while areas that do not meet these standards are known as non-attainment areas. 42 U.S.C. § 7407(d). North Dakota is an attainment area. As part of its plan to achieve and maintain the NAAQS, the EPA created New Source Performance Standards (NSPS), which impose emission standards on new major sources of air pollution, including newly constructed facilities, and on modifications to existing facilities that would increase emissions. See Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1011 (8th Cir. 2010). However, because the NSPS are aimed at helping achieve and maintain the NAAQS,

---

[1]The Honorable Charles S. Miller, Jr., United States Magistrate Judge for the District of North Dakota, now retired, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

they do not prevent air quality degradation in attainment areas, like North Dakota, where the air quality is already below NAAQS-imposed limits. See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 470-71 (2004). Recognizing that this gap existed, Congress amended the CAA to include prevention of significant deterioration of air quality (PSD) provisions, which apply to attainment areas and impose permitting requirements on the construction of "major emitting facilities." 42 U.S.C. §§ 7475, 7479(1). A major emitting facility may not be constructed until a major source permit is obtained, which requires compliance with various regulations, including the planned use of best available control technology for each pollutant emitted by the facility. 42 U.S.C. § 7475(a)(4); see also Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 846 (1984).

There are two ways for a source to be considered a major emitting facility. See 42 U.S.C. § 7479(1). First, a source constitutes a major emitting facility if it is a stationary source that is included on the list of specified industrial facilities that have a potential to emit (PTE) 100 tons per year (tpy) of any air pollutant. Id. Second, any other stationary source that has a PTE of at least 250 tpy of any air pollutant constitutes a major emitting facility. Id. Surface coal mines are not included on the list of specified industrial facilities subject to the 100 tpy threshold. See id. Therefore, the only way for a surface coal mine to be considered a major emitting facility, and thus to fall within the PSD provisions and require a construction permit, is if it has a PTE of at least 250 tpy of any air pollutant.

As a general matter, when calculating whether a source's PTE air pollutants satisfies the threshold so as to constitute a major emitting facility, the source's fugitive emissions are excluded. Fugitive emissions are "those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening." 40 C.F.R. § 51.166(b)(20). For mining operations, fugitive emissions generally take the form of coal dust. Although fugitive emissions are generally excluded, the EPA has promulgated a list of categories of sources for which fugitive emissions must be counted. See id. §§ 51.166(b)(1)(iii), 52.21(b)(1)(iii). Surface coal

-3-

mines are not included on that list. Therefore, although most surface coal mines have the PTE more than 250 tpy of dust, see Natural Resources Def. Council, Inc. v. EPA, 937 F.2d 641, 643 (D.C. Cir. 1991), those emissions consist almost entirely of fugitive emissions and, thus, the surface coal mines do not, by themselves, constitute major emitting facilities. The EPA has provided, however, that fugitive emissions must be counted when calculating the PTE air pollutants for a coal processing plant. See 40 C.F.R. §§ 51.166(b)(1)(iii)(aa), 52.21(b)(1)(iii)(aa). Therefore, a coal processing plant that has a PTE more than 250 tpy of any air pollutant, the calculation of which includes fugitive emissions, is considered a major emitting facility. Moreover, where the coal processing plant meets this threshold and is a part of a mining operation that also consists of a surface coal mine, the entire mining operation is considered a major emitting facility. Accordingly, the PSD provisions and construction permit requirement would apply to the entire mining operation, including the surface coal mine.

Further, in addition to the PSD provisions' permitting requirements, generally applicable NSPS have been established for coal processing plants that process more than 200 tons of coal per day. These regulations are contained in Subpart Y–Standards of Performance for Coal Preparation and Processing Plants, 40 C.F.R. pt. 60. Among the Subpart Y requirements, an open storage coal pile in a coal processing plant must have a fugitive dust control plan. 40 C.F.R. § 60.254(c). The parties agree that CCMC's coal processing plant is subject to Subpart Y; however, they dispute which portions of CCMC's operations constitute a part of the coal processing plant. This is of critical importance because what portions of the operation are part of the coal processing plant dictates which portions are subject to Subpart Y NSPS and are included in calculating the major source PTE air pollutants threshold. In short, those parts of the mining operation that are considered within the coal processing plant are subject to permitting and dust control requirements simply because the regulations distinguish between coal processing plants and surface coal mines.

This framework and these regulations are carried out through a cooperative relationship between the EPA and individual states. The CAA delegates to states the primary responsibility for carrying out its purposes, which states accomplish by enacting a State Implementation Plan (SIP), which details how a state plans to comply with the provisions of the CAA. See 42 U.S.C. § 7410. A state's SIP is subject to EPA approval. North Dakota has an EPA-approved SIP, which includes administration of PSD provisions. The practical effect of this set-up is that North Dakota, through the NDDOH, is the permitting authority for new facilities that require a major source construction permit under the CAA. In addition to the CAA requirements, North Dakota has adopted regulations that impose their own requirements on new facilities that do not qualify as major sources under the CAA, including mandating that these facilities obtain a minor source permit prior to construction. See N.D. Admin. Code § 33.1-15-14-03. Both the major and minor source permitting decisions are handled by the NDDOH.

CCMC mines lignite at the Coyote Creek Mine. Lignite is a low-grade coal, which is typically consumed near the mine based on the economics of lignite transportation. Coyote Creek Mine consists of two major components: the mine face itself and the coal processing facility. The mine face is connected to the coal processing facility by a private hauling road, which covers the several mile distance between the two locations. After coal is mined, trucks transport it across the haul road to the coal processing facility, where it is unloaded onto an open storage coal pile at the coal processing facility. The coal pile covers an area of roughly 8 acres and can store approximately 180,000 tons of raw, unprocessed coal and abuts a retaining wall that separates the coal pile from the crushing equipment within the coal processing facility. Near the top of the retaining wall is an apron feeder, which is where the coal is fed into the crushing equipment. The apron feeder is located a significant distance off the ground, but is rarely visible because it is typically covered by the top of the coal pile. Coal is usually drawn into the apron feeder with the assistance of gravity, but in the circumstances where the apron feeder is visible because the coal pile is not high enough to cover it, CCMC uses bulldozers to push the coal directly into the

feeder. Once the coal is loaded from the coal pile through the apron feeder, it is fed through the primary and secondary crushing equipment, which are housed within an enclosed area within the coal processing facility. Once the coal is processed, it is again transported by conveyor system to the Coyote Station, a coal-fired electric generating plant and CCMC's lone customer for the Coyote Creek Mine.

Although the coal pile has a capacity of approximately 180,000 tons of coal, CCMC has generally maintained the coal pile at between 130,000 to 145,000 tons of coal, and the pile has never dropped below 101,000 tons. CCMC recognizes that it is unlikely to use the reserve raw coal in the pile, unless a long-term emergency affected CCMC's ability to mine or deliver coal. In the case of such an emergency, the coal amassed in the coal pile would allow CCMC to meet its contractual delivery obligations for a period of three weeks.

In 2014, prior to construction of the Coyote Creek Mine, CCMC applied for a minor source permit with the NDDOH. The permit application described the entire mining operation, from the coal extraction at the mine face to the processing of the coal at the plant for transfer to Coyote Station. The permit application identified the beginning of the coal processing plant as the apron feeder, where raw coal entered into the processing equipment from the coal pile, making a distinction between the beginning of the crushing and conveying equipment and the coal pile. The application specifically stated that the coal pile is not a part of the coal processing plant because its physical location is before the processing unit and thus the coal pile is not subject to the Subpart Y regulations. Before issuing a permit, the NDDOH reviewed CCMC's application and prepared an Air Quality Effects Analysis (AQEA). The AQEA reflected that the coal pile is not a part of the coal processing plant and thus is not subject to the Subpart Y. Because the coal pile is not part of the coal processing plant, the coal pile's fugitive emissions are not counted in the calculation of the coal processing plant's PTE particulate matter for purposes of determining whether it requires a major source permit, instead of a minor source permit. Based on the emissions from the processing equipment and system alone, the NDDOH determined

-6-

that the Coyote Creek Mine is a minor source and issued the permit. The NDDOH issued the permit without providing the public the opportunity for notice and comment.

Construction of the mining operation began in 2015, and the mine was operational in 2016. During construction, the Voigts filed suit against CCMC, alleging violations of the CAA and seeking declaratory and injunctive relief and civil penalties. The Voigts alleged that construction of the Coyote Creek Mine required a major source permit, rather than the minor source permit CCMC obtained, and that CCMC's coal processing plant violated the CAA because it did not include the requisite dust control plans for coal processing facilities. If the coal pile is part of the coal processing plant, as alleged by the Voigts, Subpart Y would apply to the coal pile and mandate a fugitive dust control plan. Further, a determination that the coal pile is subject to Subpart Y as part of the coal processing plant would also bring the coal pile's fugitive emissions within the PTE air pollutants threshold calculation. Thus, whether the coal pile is subject to Subpart Y is determinative of both claims.

Both parties moved for summary judgment on the question of whether Subpart Y applies to CCMC's coal pile. The district court granted CCMC's motion and denied the Voigts' motion. In a 96-page opinion and order, the district court noted that both the Voigts and CCMC provided plausible interpretations of Subpart Y that would render the coal pile a part of or separate from the coal processing plant. Because the district court concluded that both parties provided plausible interpretations, it found Subpart Y ambiguous and relied on other sources to resolve the ambiguity, including EPA guidance and the NDDOH's permitting decision regarding the construction of the Coyote Creek Mine. Giving deference to the NDDOH's permitting decision, the district court concluded that the coal pile is not part of the coal processing plant and thus is not subject to Subpart Y. As a result, CCMC is not required to implement a fugitive dust control plan for the coal pile and the coal pile's fugitive emissions are excluded from the PTE air pollutants

determination, which necessitated only a minor source permit for the Coyote Creek Mine. The Voigts appeal.

## II.

The Voigts assert that the district court erred in granting summary judgment to CCMC and in denying their motion for summary judgment because Subpart Y clearly and unambiguously includes the coal pile as part of CCMC's coal processing plant, and thus CCMC is required to obtain a major source permit and implement a fugitive dust control plan. Further, the Voigts argue that even if Subpart Y were ambiguous regarding whether the coal pile is part of the coal processing plant, the district court erred in relying on the NDDOH permitting decision to resolve the ambiguity in CCMC's favor because the NDDOH is a state agency offering an opinion on federal law that is not entitled to any deference. "We review a district court's decision on cross-motions for summary judgment de novo." Thirty and 141, L.P. v. Lowe's Home Ctrs., Inc., 565 F.3d 443, 445-46 (8th Cir. 2009). "Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005).

## A.

The Voigts first assert that the district court erroneously concluded that the regulations are ambiguous, arguing that the clear and unambiguous language pulls the coal pile squarely within the coal processing plant and thus Subpart Y. CCMC asserts, in response, that the regulations, coupled with unambiguous EPA guidance, conclusively demonstrate that the coal pile is not part of the coal processing plant. We reject both arguments and agree with the district court that Subpart Y is ambiguous regarding whether the coal pile falls within the coal processing plant.

Subpart Y applies to coal processing plants, defined as "any facility (excluding underground mining operations) which prepares coal by one or more of the following processes: breaking, crushing, screening, wet or dry cleaning, and thermal drying." 40 C.F.R. § 60.251(e). But Subpart Y imposes performance standards on only "affected facilities *in* coal preparation and processing plants that process more than . . . (200 tons) of coal per day." 40 C.F.R. § 60.250(a) (emphasis added). Affected facilities for the purposes of Subpart Y performance standards is defined to include "[t]hermal dryers, pneumatic coal-cleaning equipment (air tables), coal processing and conveying equipment (including breakers and crushers), coal storage systems, transfer and loading systems, and *open storage piles*."[2] Id. § 60.250(d) (emphasis added). Thus, an open storage pile, defined as "any facility, including storage area, that is not enclosed that is used to store coal, including the equipment used in the loading, unloading, and conveying operations of the facility," id. § 60.251(m), is subject to Subpart Y as an affected facility where it is in the coal processing plant. However, the regulations do not define what it means for an affected facility to be "in" a coal processing plant.

The Voigts assert that the definitions of coal processing plant and open storage pile clearly demonstrate that Subpart Y broadly applies to open storage piles, regardless of their location before or after the coal crushing equipment. CCMC argues the EPA guidance unambiguously dictates that the regulations apply only to open storage piles where the piles occur past the first hopper, which is the component into which coal is loaded in bulk and is tapered downward in smaller segments toward the crushing equipment. We disagree with both parties' contentions. The regulations

---

[2]The parties do not dispute the application of Subpart Y to the coal processing and conveying equipment, defined as "any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts. Equipment located at the mine face is not considered to be part of the coal preparation and processing plant." 40 C.F.R. § 60.251(f).

simply do not provide an unambiguous answer to the inquiry here: whether a coal pile that is adjacent to the coal processing equipment, and is used for both storage and loading coal into the coal processing equipment, is "in" the coal processing plant itself. Indeed, as the district court noted, both parties provide plausible conflicting interpretations of the regulations, underscoring the ambiguity that exists. While the regulations clearly contemplate the inclusion of coal piles that are within coal processing plants, they do not provide unambiguous direction as to when exactly a coal pile is "in" a coal processing plant so as to be considered an affected facility subject to Subpart Y requirements.

Because we conclude the regulations are ambiguous, we turn to subsequent interpretative guidance to aid us in determining whether the coal pile is part of the coal processing plant. See Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 278 (2009); see also Kisor v. Wilkie, 139 S. Ct. 2400 (2019). Kisor instructs that deference to EPA guidance is appropriate where "(1) the regulation [is] genuinely ambiguous; (2) the agency's interpretation of the regulation [is] reasonable; (3) the interpretation [is] the agency's authoritative or official position; (4) the interpretation . . . in some way implicate[s] the agency's substantive expertise; and (5) the interpretation . . . reflect[s] fair and considered judgment." Wells Fargo & Co. v. United States, 957 F.3d 840, 855 (8th Cir. 2020) (Grasz, J., dissenting in part) (citing Kisor, 139 S. Ct. at 2415-18).

With respect to the dispositive issues in this case, the EPA has offered some clarification on when a coal pile is considered to be "in" a coal processing plant:

> It should be noted that if the coal is unloaded for the purpose of storage, then the unloading activity is not an affected facility under NSPS Subpart Y. The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y.

New Source Performance Standards (NSPS)—Applicability of Standards of Performance for Coal Preparation Plants to Coal Unloading Operations, 63 Fed. Reg. 53288-01, 53289 (Oct. 5, 1998). And the EPA has reiterated this point, again stating that "coal must be directly unloaded into receiving equipment" for Subpart Y applicability. Id. The EPA further stated in its responses to comments on proposed amendments to Subpart Y that it "interprets coal unloading into the first hopper 'downstream' from any form of transportation to be the beginning of the 'coal preparation plant.'" Response to Comments Received on Proposed 2009 Amendments, Standards of Performance for Coal Preparation and Processing Plants (Subpart Y), R. Doc. 38-5, at 89; see also Standards of Performance for Coal Preparation and Processing Plants, 74 Fed. Reg. 51950-01, 51958 (Oct. 8, 2009) ("A coal preparation and processing plant begins at the first hopper (i.e. drop point) used to unload coal . . . .").

Although this EPA guidance expands upon the gap in the regulations defining where precisely a coal processing plant begins for the purposes of whether an affected facility is "in" a coal processing plant, we agree with the district court that it too does not provide a conclusive answer, particularly where, as here, the coal pile is used for storage, unloading, and feeding purposes. The record reflects that CCMC's coal pile plays a necessary role in the process by which coal is directly unloaded into receiving equipment, or the apron feeder; however, the record also reflects that the coal pile is maintained at its size for storage purposes to allow CCMC to fulfill contractual obligations in the event of a delay or shutdown at the mine face. The coal pile is, in essence, a hybrid between a storage and unloading pile. There is thus no clear cut answer as to whether the coal pile is for storage—and unaffected by Subpart Y—or part of direct unloading into receiving equipment—and subject to Subpart Y. Having reviewed the relevant regulations and EPA guidance, we conclude that they do not provide a clear answer as to whether CCMC's coal pile is "in" the coal processing plant so as to qualify as an affected facility subject to Subpart Y.

Given the foregoing, the district court did not err in concluding that the regulations are ambiguous or in ultimately concluding that the regulations, combined with the guidance, do not resolve the relevant inquiry. We agree with the district court that the best interpretative aid to determine whether Subpart Y applies to the coal pile is the NDDOH permitting decision, which concluded that the coal pile is not part of the coal processing plant and thus is not subject to Subpart Y. And, as discussed below, that decision is entitled to deference.

B.

The Voigts next argue that the NDDOH permitting decision is not entitled to any deference because it represents no more than a state agency's interpretation of federal law. The Voigts specifically argue that the EPA has expressly reserved the authority to interpret its own NSPS regulations and the EPA does not and cannot delegate authority to states to make decisions affecting the uniform applicability and consistency of NSPS. The Voigts also assert that the issuance of a permit without a public notice and comment period further demonstrates why deference is unwarranted.

First, the Voigts' contention regarding the EPA's authority ignores the system of cooperative federalism that exists to help achieve the aims of the CAA. "Under the CAA's cooperative-federalism scheme, the EPA directs states to submit state implementation plans to assure reasonable progress toward the CAA's national visibility goals." Nat'l Parks Conservation Ass'n v. EPA, 759 F.3d 969, 971 (8th Cir. 2014) (internal quotation marks omitted).

> The Clean Air Act requires states to develop state statutory and regulatory programs that implement the air quality planning objectives of the Clean Air Act. These state programs are incorporated into a State Implementation Plan ("SIP"), which the EPA reviews and approves. Once the EPA approves a SIP, the state acquires "SIP-approved" status for the EPA-approved air quality programs. Thereafter, the state has

primary responsibility for implementing federal air quality planning goals.

United States v. Minnkota Power Co-op Inc., 831 F. Supp. 2d 1109, 1113 (D.N.D. 2011). And the EPA has expressly delegated authority to the State of North Dakota to implement NSPS rules. See Automatic Delegation of Authority to the States of Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming to Implement and Enforce New Source Performance Standards (Automatic Delegation), 79 Fed. Reg. 60993-01, 60994 (Oct. 9, 2014) ("The CAA section 111(c) authorizes the EPA to delegate authority to any state agency which submits adequate regulatory procedures for implementation and enforcement of the NSPS program.").

The EPA-delegated primary responsibility for carrying out the CAA air quality goals takes the form of issuance of preconstruction permits: "states issue the preconstruction permits in accordance with their SIPs and federal minimum standards." Nucor Steel-Ark. v. Big River Steel, LLC, 825 F.3d 444, 447 (8th Cir. 2016). Because implementation of the CAA hinges on a system of cooperative federalism and North Dakota has an EPA-approved SIP, North Dakota is the primary party enforcing the CAA for the State.

Second, the district court's exhaustive and well-reasoned opinion demonstrates that the NDDOH permitting decision does not run afoul of the relevant regulations and EPA guidance. The district court explicitly noted that the NDDOH decision was entitled to deference because (1) the determination that the coal pile is not part of the coal processing plant is consistent with EPA guidance describing the beginning of a coal processing plant as the "first hopper"; (2) the coal pile contains only unprocessed raw coal; (3) most of the coal pile consists of coal stored long-term in the event of a delay or shutdown at the mine face; and (4) the exclusion of the coal pile from the coal processing plant does not eviscerate the regulations as they would still apply to coal piles in a coal processing plant, particularly those that contained processed coal. As the primary body responsible for issuing permits based upon the CAA standards, North Dakota is in the best position to decide whether a given facility falls within or

-13-

satisfies the CAA standards, and that decision is entitled to deference. We agree with the district court that the above factors demonstrate that the NDDOH's conclusion that the coal pile is not part of the coal processing plant is not an arbitrary or unreasonable position inconsistent with the EPA and CAA's aims. We decline to second-guess the NDDOH's exercise of its authority. See Minnkota, 831 F. Supp. 2d at 1121 ("North Dakota's conclusions regarding such highly technical matters are entitled to deference unless the EPA proves them to be unreasonable, arbitrary, or capricious.").

Regarding the Voigts' assertion that giving deference to the NDDOH permitting decision undercuts the EPA's non-delegable authority to make legal determinations in order to preserve the uniformity and consistency of NSPS on a national level, the Voigts again ignore the cooperative framework where states are tasked with carrying out the CAA's aims, which include making determinations regarding NSPS applicability. Although factual determinations are often necessarily intertwined with legal issues, there is no suggestion that the NDDOH exceeded its authority, delegated by the EPA, in carrying out its SIP to make an NSPS applicability determination and in issuing the preconstruction minor source permit to CCMC. See Automatic Delegation, 79 Fed. Reg. at 60994 (stating that delegated authority under SIP includes "implementation and enforcement of NSPS program"). The process for NSPS enforcement would be significantly impaired if the state authority did not have the ability to make determinations based on application of given facts to the SIP and EPA framework. Further, state permitting decisions are not immune from review; "unreasonable, arbitrary, or capricious" exercises of the NDDOH's authority that could result in national inconsistency may be challenged. See Minnkota, 831 F. Supp. 2d at 1121. The existence of this avenue to challenge aberrant decisions guards against the risk of national inconsistency. We are thus unpersuaded by the Voigts' contention that affording the NDDOH permitting decision deference will result in national inconsistency.

We finally note that our conclusions are not affected by the Voigts' purported exclusion from the permitting process due to a lack of a public notice and comment

period.  As the district court noted, the lack of a public notice and comment period resulted in this case coming to us "in a much different posture" than it would have "had defendant requested the NDDOH follow a more formal process in the handling of its application for the construction permit[.]"  R. Doc. 127, at 7.  The district court acknowledged that this process would have allowed the Voigts "the opportunity to make the arguments they are now making to the NDDOH; the NDDOH could have addressed them; and then, if either plaintiffs or defendant were disappointed in its decisions, there would have been the right of an appeal . . . that . . . could have been resolved based upon a formal administrative record."  R. Doc. 127, at 7-8.  Although that may have been the preferred course, the absence of public notice and comment does not require us to unwind the NDDOH permitting decision on that basis alone, particularly where the Voigts have had judicial recourse to raise the arguments they would have raised during a notice and comment period.

On the record before us and given the overarching framework of the CAA, including the cooperative relationship between the EPA and the states, we conclude the district court appropriately gave deference to the NDDOH permitting decision to resolve the regulations' ambiguity in favor of CCMC.  The district court thus did not err in granting summary judgment to CCMC on the basis that the coal pile is not subject to Subpart Y regulations, which would have required a major source permit and a fugitive dust control plan.

III.

For the foregoing reasons, we affirm the judgment of the district court.

STRAS, Circuit Judge, dissenting.

Most Americans would be surprised to learn that state bureaucrats can play an even larger role than federal judges do in interpreting federal law.  Yet by deferring to the North Dakota Department of Health's interpretation of a Clean Air Act

-15-

regulation, the court's decision has just that effect. In my view, even if we must defer to a *federal* agency's interpretation of a *federal* statute, *see Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), and a *federal* agency's interpretation of a *federal* regulation, *see Auer v. Robbins*, 519 U.S. 452 (1997), it defies basic constitutional principles to defer to a *state* agency's interpretation of *federal* law. For that reason, I respectfully dissent from today's unveiling of *Voigt* deference.

## I.

Our interpretive task in this case is technical. We must determine whether Coyote Creek's coal pile is an "affected facilit[y] *in* [a] coal preparation and processing plant[]." 40 C.F.R. § 60.250(a) (emphasis added). If it is, then the Environmental Protection Agency's ("EPA") Standards of Performance for Coal Preparation and Processing Plants ("Subpart Y") apply. Relying on an interpretation by the North Dakota Department of Health, the court holds that it is not.

At first glance, the court's holding may seem mundane, given that this case is about whether a particular pile of coal happens to be "in" a coal plant. 40 C.F.R. § 60.250(a). But there is a more fundamental principle at stake about who gets to say what federal law means. Although the court allows a state agency to do it, I believe the Constitution places the responsibility with us.

## II.

One might be under the mistaken impression that looking to states for assistance is unique to the Clean Air Act. It is not. In a sprawling administrative state, the federal government often asks states to implement federal policy. There are numerous examples of cooperative federalism at work: the Medicaid Act, the Telecommunications Act of 1996, and the Clean Water Act, to name just a few.

In the abstract, cooperative federalism makes sense. It allows states to account for their own unique needs in implementing federal law. But when implementation spills over into interpretation, the calculus changes. At that point, state agencies should not have a special role—much less a decisive one—in telling us what a federal statute or regulation means.

For its part, the court cites *no* controlling authority that requires us to defer to a state agency. No Supreme Court or Eighth Circuit case even suggests that it is appropriate, and for good reason. *See, e.g.*, *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–18 (2019) (discussing the requirements for courts to defer to a *federal* agency's interpretation of its own ambiguous regulations); *United States v. Mead Corp.*, 533 U.S. 218, 227–31 (2001) (explaining when a *federal* agency's interpretation of a federal statute deserves deference). It runs afoul of both horizonal and vertical separation-of-powers principles.

## A.

Let's start with the horizontal component—what typically comes to mind when hearing the words, "separation of powers." The Constitution divides the powers of the federal government into three distinct branches: the executive, the legislative, and the judicial. *See INS v. Chadha*, 462 U.S. 919, 951 (1983). As Joseph Story straightforwardly put it, "the powers of one [branch] ought not to be exercised by either of the others." 2 Joseph Story, *Commentaries on the Constitution of the United States* § 1416, at 260 (Boston, Charles C. Little & James Brown eds., 1851).

The judicial branch, which includes "one supreme Court, and [] such inferior Courts as the Congress may from time to time ordain and establish," alone exercises "[t]he judicial Power of the United States." U.S. Const. art. III, § 1. This power, as Alexander Hamilton explained in Federalist 78, includes "[t]he interpretation of the laws," which he called "the proper and peculiar province of the courts." The Federalist No. 78, at 467 (Alexander Hamilton) (Clinton Rossiter ed., 1961). The duty

was a familiar one, for judges had already been doing it for centuries. *See Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 119–20 (2015) (Thomas, J., concurring in the judgment) (collecting historical sources).

The Framers had reason to place the interpretive power in the judicial branch. *See* Thomas Sergeant, *Constitutional Law: Being a View of the Practice and Jurisdiction of the Courts of the United States, and of Constitutional Points Decided* 18 (Philadelphia, P.H. Nicklin & T. Johnson eds., 1830). Experiences in England and under the Articles of Confederation had shown a tendency for the other branches of government to borrow the judicial power piece by piece. *See Perez*, 575 U.S. at 124–25 (Thomas, J., concurring in the judgment) (discussing King James I's pressure on judges to approve his attempts to raise revenue without Parliament's participation); *see also Prohibitions Del Roy* (1607), 77 Eng. Rep. 1342, 12 Co. Rep. 64 (KB); Gordon S. Wood, *The Creation of the American Republic: 1776–1787*, at 408 (1998) (describing "[t]he assumption of the judicial [power] . . . into the hands of the [state] legislative branch[es]" (quotation marks omitted)).

The natural tendency of the other branches to try to accumulate power is why the Framers chose to create three distinct branches of government, with "fences" between them. *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 240 (1995). As James Madison warned, "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands . . . may justly be pronounced the very definition of tyranny." The Federalist No. 47, *supra*, at 301 (James Madison). Alexander Hamilton foresaw that this danger could extend to the courts, writing that "liberty can have nothing to fear from the judiciary alone, but would have everything to fear from its union with either of the other departments." The Federalist No. 78, *supra*, at 466 (Alexander Hamilton).

The threat to the judiciary's interpretive power is once again right out in the open. Over the last century, the growth of the administrative state has chipped away at it, while judicial-deference doctrines have acquiesced in—perhaps even

encouraged—this development, in a marked departure from both historical practice and the Framers' constitutional design. *See*, *e.g.*, *Decatur v. Paulding*, 39 U.S. 497, 515 (1840) (stating that courts were not obligated to give weight to an executive official's interpretation of law if the court thought differently); *see also Perez*, 575 U.S. at 114 (Thomas, J., concurring in the judgment) (noting that the "doctrine of deference . . . has taken on a life of its own").

This case is a prime example. Executive-branch officials in North Dakota determined that Coyote Creek's coal pile is not "in" its plant. 40 C.F.R. § 60.250(a). Rather than using "recognized tools of interpretation" and exercising independent judgment, *Perez*, 575 U.S. at 123 (Thomas, J., concurring in the judgment), the court starts with a thumb on the scale in favor of North Dakota's interpretation. The question becomes what the executive branch believes the regulation means, not what we, as judges, think. This "transfer of interpretive judgment raises serious separation-of-powers concerns," *id.* at 124, because it involves the exchange of an "independent decisionmaker" for an "avowedly politicized administrative agent seeking to pursue whatever policy whim may rule the day," *Gutierrez-Brizuela v. Lynch*, 834 F.3d 1142, 1153 (10th Cir. 2016) (Gorsuch, J., concurring).

B.

The case for deference becomes even weaker when the interpreter is a state or local government official. The reason is the vertical separation of powers, more commonly known as federalism. One of "[t]he great innovation[s]" of the Constitution, *Printz v. United States*, 521 U.S. 898, 920 (1997), was the creation of a "system of dual sovereignty," *Gregory v. Ashcroft*, 501 U.S. 452, 457 (1991)—the idea of "an indestructible Union, composed of indestructible States," *Texas v. White*, 74 U.S. 700, 725 (1869).

The "characteristic difference" between the Constitution and the Articles of Confederation was the ability of the federal government to regulate citizens directly,

*Cohens v. Virginia*, 19 U.S. 264, 309 (1821), without "the intervention of the State legislatures," The Federalist No. 16, *supra*, at 117 (Alexander Hamilton); *see* The Federalist No. 15, *supra*, at 108 (Alexander Hamilton). Any legislation passed by the new federal government became binding, even on the states, under the Supremacy Clause:

> This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.

U.S. Const. art. VI, cl. 2; *see Cohens*, 19 U.S. at 382 (describing "the subordination of the State governments to th[e] Constitution").

Judges would play a role in ensuring federal supremacy, at least when the federal government operated within its enumerated powers. *See* The Federalist No. 82, *supra*, at 491 (Alexander Hamilton) (stating that dual sovereignty would "originate questions of intricacy and nicety"). As the Supreme Court soon made clear, judges are responsible for saying "what the law is," *Marbury v. Madison*, 5 U.S. 137, 177 (1803), which sometimes entails checking local interests, *see Martin v. Hunter's Lessee*, 14 U.S. 304, 347 (1816).

The "structural protections" afforded to judges, like life tenure and non-diminishment of salary, *Perez*, 575 U.S. at 121–22 (Thomas, J., concurring in the judgment), would, when necessary, guard against the dominance of those interests, *Martin*, 14 U.S. at 347; *see also Cooper v. Aaron*, 358 U.S. 1, 23–24 (1958) (Frankfurter, J., concurring); Story, *supra*, § 1599, at 388 (explaining the constitutional choice to insulate judicial appointments from popular elections). Federal judges, not states or officials within those states, would have the *final* say over what federal law means, *see Martin*, 14 U.S. at 355, even if the question was

"difficult[]," "doubtful," or "the strongest State feelings were engaged," *Cohens*, 19 U.S. at 404, 421.

## C.

Under these basic structural principles, it should be clear that the Constitution does not leave room for *state executive-branch* officials to tell *federal judges* what *federal* law means. Rather than bending to "local habits [or] feelings," *Cooper*, 358 U.S. at 25 (Frankfurter, J., concurring), our job is to exercise *independent* judgment "to say what the law is," *Marbury*, 5 U.S. at 177, even when—perhaps especially when—someone else interprets the law differently, *see* The Federalist No. 78, *supra*, at 467 (Alexander Hamilton).

By extending deference to state executive-branch officials, the court has taken what so far has been only a horizontal separation-of-powers problem and expanded it vertically. A state bureaucrat, who unquestionably has "state attachments . . . and [] interests," *Martin*, 14 U.S. at 347, now has more say over Clean Air Act regulations than we do. No one would seriously argue, to use a slightly different example, that we should defer to what state judges say federal law means, *see Cohens*, 19 U.S. at 420, even though they are "bound" to interpret and apply it just as we are, U.S. Const. art. VI, cl. 2. *But see* 28 U.S.C. § 2254(d) (requiring deference to state-court judgments in federal-habeas-corpus proceedings). Yet in the court's view, somehow state executive-branch officials are different.

It also apparently does not matter that this case involves a double delegation: one from Congress to a federal agency and another from a federal to a state agency. Even if we have to accept the validity of the first delegation, *see Chevron*, 467 U.S. at 843–44, state agencies "are neither regional offices nor administrative agencies of the Federal Government," *New York v. United States*, 505 U.S. 144, 188 (1992). Nor, unlike state judges, are they entrusted by the Constitution with the duty to interpret federal law. U.S. Const. art. VI, cl. 2.

In the end, the Supremacy Clause is one of the main losers. *See Mayo v. United States*, 319 U.S. 441, 445 (1943) (describing how the Supremacy Clause furthers "uniformity"). North Dakota, one of many states that has the power to *implement* the Clean Air Act, *see Automatic Delegation of Authority to the States of Colorado, Montana, North Dakota, South Dakota, Utah, and Wyoming to Implement and Enforce New Source Performance Standards*, 79 Fed. Reg. 60993, 60993 (Oct. 9, 2014), has already decided that Coyote Creek's coal pile is not "in" the plant. Suppose that its neighbor, South Dakota, goes the other way when confronted with a similar coal pile and that the Missouri Department of Natural Resources adopts yet a third interpretation. *See Standards of Performance for New Stationary Sources (NSPS) and National Emission Standards for Hazardous Air Pollutants (NESHAP); Delegation of Authority to the States of Iowa, Kansas, Missouri, Nebraska, Lincoln-Lancaster County, Nebraska, and the City of Omaha, Nebraska*, 63 Fed. Reg. 1746, 1746 (Jan. 12, 1998).

In this scenario, a federal regulation would be subject to three different interpretations—all within a single circuit—despite the stated preference in the Clean Air Act for federal coordination over air pollution. *See* 42 U.S.C. § 7401(a)(4) ("Federal . . . leadership is essential for the development of cooperative Federal, State, regional, and local programs to prevent and control air pollution."). No longer would there be "uniformity" of federal law in this circuit, much less "throughout the whole United States." *Martin*, 14 U.S. at 348. And in a complete turnabout from *Marbury*, no one would have the final say over "what the law [actually] is." 5 U.S. at 177; *see also Martin*, 14 U.S. at 348 (discussing the dangers of having "no revising authority to control [] jarring and discordant judgments[] and harmonize them").

III.

Even aside from the constitutional problems, there are other good reasons not to defer here. To start, the Supreme Court has never, to my knowledge, deferred to an agency's interpretation of a regulation that it did not write itself. *Kisor* identifies

-22-

the reason: "the agency that promulgated a rule is in [a] better position to reconstruct its original meaning." 139 S. Ct. at 2412 (plurality opinion) (internal quotation marks and brackets omitted). However persuasive this justification may otherwise be,[3] it does not apply to the North Dakota Department of Health, which played no part in writing Subpart Y.

Nor does the agency's interpretation represent its "fair and considered judgment." *Id*. at 2417 (majority opinion) (quotation marks omitted). Even if we were to assume that the North Dakota Department of Health has technical expertise under the Clean Air Act, its decision was made by an engineer who took Coyote Creek at its word that the coal pile was not covered by Subpart Y. Then the agency, apparently without studying the matter further, simply stood by the engineer's determination. This sequence of events raises the possibility that its interpretation may just be a "post hoc rationalization." *Id*. (italics, quotation marks, and brackets omitted). At the very least, it fosters doubt about whether it is the "official position" of the agency. *Id*. at 2416 (quotation marks omitted).

IV.

Deference makes a difference here. Deference leads to one conclusion: Coyote Creek's coal pile, an "affected facilit[y]," is *not* "in" the "coal preparation and processing plant[]." 40 C.F.R. § 60.250(a). The plain language leads to another: the pile *is* in the plant.

---

[3]Another justification for deference is that a single agency can resolve interpretive issues by uniform administrative decision rather than "piecemeal . . . litigation." *Kisor*, 139 S. Ct. at 2413 (plurality opinion). This rationale goes out the window, however, when the administrative decision gets spread among multiple separate state agencies. Indeed, even when only federal agencies are involved, deference is not automatic when decisionmaking authority is shared. *See Martin v. Occupational Safety & Health Rev. Comm'n*, 499 U.S. 144, 151–57 (1991).

The word "in," used as a preposition to describe location, has an unambiguous meaning: "[w]ithin the limits, bounds, or area of." *The American Heritage Dictionary of the English Language* 885 (5th ed. 2016). Applying this definition and leaving the technical jargon aside, the regulation requires us to decide whether the "affected facilit[y]"—here, the coal pile—is physically "[w]ithin the limits, bounds, or area of" the Coyote Creek plant. 40 C.F.R. § 60.250(a); *American Heritage Dictionary*, *supra*, at 885. Everyone, including the EPA, agrees that the apron feeder, which receives the coal for conveyance into the crushing equipment, is "in" the plant. *See* Response to Comments Received on Proposed 2009 Amendments, *Standards of Performance for Coal Preparation and Processing Plants (Subpart Y)*, R. Doc. 38-5, at 83–84 (hereinafter, "EPA Guidance"); Appellant Br. at 14, 25; Appellee Br. at 40. So it follows that the coal pile, which fully envelops and surrounds the apron feeder, is in the plant, too.

No other conclusion is possible in light of the remainder of the regulation. First, included among "affected facilities" are "open storage piles." 40 C.F.R. § 60.250(d). What this means, again leaving the technical jargon aside, is that piles of coal are capable of being "in" a coal plant. *Id.* § 60.250(a). Second, as the words "open" and "storage" suggest, an "open storage pile[]" is "*not* enclosed [and] is used to store coal." *Id.* § 60.251(m) (emphasis added). Combined with the first point, it means that a non-enclosed coal pile can still be "in" the plant. If Coyote Creek's coal pile, which fully envelops the apron feeder, is not one of those piles, it is hard to imagine what "open storage pile[]" would be. *Id.* § 60.250(d).

Seeking to defend the agency's decision, Coyote Creek can barely muster a textual argument to the contrary. *See* Appellee Br. 35–36. Its position, based loosely on an EPA guidance, is that the plant can only begin at the apron feeder, so its pile of unprocessed coal cannot be in the plant. *See* EPA Guidance 83–84 (stating that the beginning of the coal plant is at "the first hopper"). The regulation, however, neither draws the line where Coyote Creek says nor distinguishes between processed and unprocessed coal. Instead, by including "coal processing and conveying equipment"

as "affected facilities," it anticipates that some of the coal "in" the plant will be unprocessed, at least before it reaches the "coal[-]processing" equipment.  40 C.F.R. § 60.250(a), (d).  Coyote Creek's interpretation, in other words, is unreasonable.

\*     \*     \*

To sum up, I would not defer to the North Dakota Department of Health's interpretation of a federal regulation.  Rather, using "recognized tools of interpretation," *Perez*, 575 U.S. at 123 (Thomas, J., concurring in the judgment), I would conclude that Coyote Creek's coal pile is "in" the plant.  40 C.F.R. § 60.250(a).

_____