# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2705
_____

Casey Voigt; Julie Voigt

*Plaintiffs - Appellants*

v.

Coyote Creek Mining Company, LLC, a North Dakota Corporation

*Defendant - Appellee*

------------------------------

State of North Dakota; Lignite Energy Council

*Amici on Behalf of Appellee(s)*
_____

Appeal from United States District Court
for the District of North Dakota - Bismarck
_____

Submitted: December 30, 2020
Filed: June 1, 2021
_____

Before LOKEN, SHEPHERD, and STRAS, Circuit Judges.
_____

SHEPHERD, Circuit Judge.

Casey and Julie Voigt, the owners of a large ranch in rural North Dakota, filed suit against Coyote Creek Mining Company, LLC (CCMC), alleging CCMC failed to obtain the proper construction permit under the Clean Air Act (CAA), 42 U.S.C. § 7401, et seq., and failed to implement the requisite dust control plan for the Coyote Creek Mine, which is adjacent to the Voigts' ranch. CCMC moved for summary judgment on the Voigts' claims, and the Voigts moved for partial summary judgment on issues of liability. The district court[1] granted summary judgment in favor of CCMC, concluding the federal regulations imposing permitting and dust control requirements do not apply to CCMC's operations. The Voigts appeal, arguing the district court erroneously determined the regulations are ambiguous and improperly relied on the North Dakota Department of Health (NDDOH) permitting decision to reach its conclusion. Having jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

Pursuant to the CAA, the Environmental Protection Agency (EPA) established National Ambient Air Quality Standards (NAAQS), which are designed to improve air quality by placing limits on six specific air pollutants, including, as relevant here, particulate matter. 42 U.S.C. §§ 7408-09; see also Util. Air Regul. Grp. v. EPA, 573 U.S. 302, 308 (2014). Particulate matter is the air pollutant most commonly associated with mining operations. Areas of the country where the air quality meets the NAAQS are called attainment areas, while areas that do not meet these standards are known as non-attainment areas. 42 U.S.C. § 7407(d). North Dakota is an attainment area. As part of its plan to achieve and maintain the NAAQS, the EPA created New Source Performance Standards (NSPS), which impose emission standards on new major sources of air pollution, including newly constructed facilities, and on modifications to existing facilities that would increase emissions.

---

[1]The Honorable Charles S. Miller, Jr., United States Magistrate Judge for the District of North Dakota, now retired, to whom the case was referred for final disposition by consent of the parties pursuant to 28 U.S.C. § 636(c).

See Sierra Club v. Otter Tail Power Co., 615 F.3d 1008, 1011 (8th Cir. 2010). However, because the NSPS are aimed at helping achieve and maintain the NAAQS, they do not prevent air quality degradation in attainment areas, like North Dakota, where the air quality meets the NAAQS. See Alaska Dep't of Envtl. Conservation v. EPA, 540 U.S. 461, 470-71 (2004). Recognizing that this gap existed, Congress amended the CAA to include prevention of significant deterioration of air quality (PSD) provisions, which apply to attainment areas and impose permitting requirements on the construction of "major emitting facilities." Id.; 42 U.S.C. §§ 7475, 7479(1). A major emitting facility may not be constructed until a major source permit is obtained, which requires compliance with various regulations, including the planned use of best available control technology for each pollutant emitted by the facility. 42 U.S.C. § 7475(a)(4); see also Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc., 467 U.S. 837, 846 (1984).

There are two ways for a source of emissions to be considered a major emitting facility. See 42 U.S.C. § 7479(1). First, a source constitutes a major emitting facility if it is a stationary source that is included on the list of specified industrial facilities that have a potential to emit (PTE) 100 tons per year (tpy) of any air pollutant. Id. Second, any other stationary source that has a PTE of at least 250 tpy of any air pollutant constitutes a major emitting facility. Id. Surface coal mines are not included on the list of specified industrial facilities subject to the 100 tpy threshold. See id. Therefore, the only way for a surface coal mine to be considered a major emitting facility, and thus to fall within the PSD provisions and require a construction permit, is if it has a PTE of at least 250 tpy of any air pollutant.

As a general matter, when calculating whether a source's PTE air pollutants satisfies the threshold so as to constitute a major emitting facility, the source's fugitive emissions are excluded. Fugitive emissions are "those emissions which could not reasonably pass through a stack, chimney, vent, or other functionally equivalent opening." 40 C.F.R. § 51.166(b)(20). For mining operations, fugitive emissions generally take the form of coal dust. Although fugitive emissions are generally

-3-

excluded, the EPA has promulgated a list of categories of sources for which fugitive emissions must be counted. See id. §§ 51.166(b)(1)(iii), 52.21(b)(1)(iii). Surface coal mines are not included on that list. Therefore, although most surface coal mines have the PTE more than 250 tpy of dust, see Natural Resources Defense Council, Inc. v. EPA, 937 F.2d 641, 643 (D.C. Cir. 1991), those emissions consist almost entirely of fugitive emissions and, thus, the surface coal mines do not, by themselves, constitute major emitting facilities. The EPA has provided, however, that fugitive emissions must be counted when calculating the PTE air pollutants for a coal processing plant. See 40 C.F.R. §§ 51.166(b)(1)(iii)(aa), 52.21(b)(1)(iii)(aa). Therefore, a coal processing plant that has a PTE more than 250 tpy of any air pollutant, the calculation of which includes fugitive emissions, is considered a major emitting facility. Moreover, where the coal processing plant meets this threshold and is a part of a mining operation that also consists of a surface coal mine, the entire mining operation is considered a major emitting facility. Accordingly, the PSD provisions and construction permit requirement would apply to the entire mining operation, including the surface coal mine.

Further, in addition to the PSD provisions' permitting requirements, generally applicable NSPS have been established for coal processing plants that process more than 200 tons of coal per day. These regulations are contained in Subpart Y–Standards of Performance for Coal Preparation and Processing Plants, 40 C.F.R. pt. 60, Subpart Y. Among the Subpart Y requirements, an open storage coal pile in a coal processing plant must have a fugitive dust control plan. 40 C.F.R. § 60.254(c). The parties agree that CCMC's coal processing plant is subject to Subpart Y; however, they dispute which portions of CCMC's operations constitute a part of the coal processing plant. This is of critical importance because what portions of the operation are part of the coal processing plant dictates which portions are subject to Subpart Y NSPS and are included in calculating the major source PTE air pollutants threshold. In short, those parts of the mining operation that are considered within the coal processing plant are subject to permitting and dust control requirements simply

-4-

because the regulations distinguish between coal processing plants and surface coal mines.

This framework and these regulations are carried out through a cooperative relationship between the EPA and individual states. The CAA delegates to states the primary responsibility for carrying out its purposes, which states accomplish by enacting a State Implementation Plan (SIP) detailing how a state plans to comply with the provisions of the CAA. See 42 U.S.C. § 7410. A state's SIP is subject to EPA approval. See id. North Dakota has an EPA-approved SIP, which includes administration of PSD provisions. The practical effect of this set-up is that North Dakota, through the NDDOH, is the permitting authority for new facilities that require a major source construction permit under the CAA. In addition to the CAA requirements, North Dakota has adopted regulations that impose their own requirements on new facilities that do not qualify as major sources under the CAA, including mandating that these facilities obtain a minor source permit prior to construction. See N.D. Admin. Code § 33.1-15-14-03. Both the major and minor source permitting decisions are handled by the NDDOH.

CCMC mines lignite at the Coyote Creek Mine. Lignite is a low-grade coal, which is typically consumed near the mine based on the economics of lignite transportation. Coyote Creek Mine consists of two major components: the mine face itself and the coal processing facility. The mine face is connected to the coal processing facility by a private hauling road, which covers the several mile distance between the two locations. After coal is mined, trucks transport it across the haul road to the coal processing facility, where it is unloaded onto an open storage coal pile at the coal processing facility. The coal pile covers an area of roughly eight acres and can store approximately 180,000 tons of raw, unprocessed coal and abuts a retaining wall that separates the coal pile from the crushing equipment within the coal processing facility. Near the top of the retaining wall is an apron feeder, which is where the coal is fed into the crushing equipment. The apron feeder is located a significant distance off the ground, but is rarely visible because it is typically covered

by the top of the coal pile. Coal is usually drawn into the apron feeder with the assistance of gravity, but in the circumstances where the apron feeder is visible because the coal pile is not high enough to cover it, CCMC uses bulldozers to push the coal directly into the feeder. Once the coal is loaded from the coal pile through the apron feeder, it is fed through the primary and secondary crushing equipment, which are housed in an enclosed area within the coal processing facility. Once the coal is processed, it is again transported by conveyor system to the Coyote Station, a coal-fired electric generating plant and CCMC's lone customer for the Coyote Creek Mine.

Although the coal pile has a capacity of approximately 180,000 tons of coal, CCMC has generally maintained the coal pile at between 130,000 to 145,000 tons of coal, and the pile has never dropped below 101,000 tons. CCMC recognizes that it is unlikely to use the reserve raw coal in the pile, unless a long-term emergency affected CCMC's ability to mine or deliver coal. In the case of such an emergency, the coal amassed in the coal pile would allow CCMC to meet its contractual delivery obligations for a period of three weeks.

In 2014, prior to construction of the Coyote Creek Mine, CCMC applied for a minor source permit with the NDDOH. The permit application described the entire mining operation, from the coal extraction at the mine face to the processing of the coal at the plant for transfer to Coyote Station. The permit application identified the beginning of the coal processing plant as the apron feeder, where raw coal entered into the processing equipment from the coal pile, making a distinction between the beginning of the crushing and conveying equipment and the coal pile. The application specifically stated that the coal pile is not a part of the coal processing plant because its physical location is before the processing unit and thus the coal pile is not subject to the Subpart Y regulations. Before issuing a permit, the NDDOH reviewed CCMC's application and prepared an Air Quality Effects Analysis (AQEA). The AQEA reflected that the coal pile is not a part of the coal processing plant and thus is not subject to the Subpart Y. Because the coal pile is not part of the coal processing

plant, the coal pile's fugitive emissions are not counted in the calculation of the coal processing plant's PTE particulate matter for purposes of determining whether it requires a major source permit, instead of a minor source permit. Based on the emissions from the processing equipment and system alone, the NDDOH determined that the Coyote Creek Mine is a minor source and issued the permit. The NDDOH issued the permit without providing the public the opportunity for notice and comment.

Construction of the mining operation began in 2015, and the mine was operational in 2016. During construction, the Voigts filed suit against CCMC, alleging violations of the CAA and seeking declaratory and injunctive relief and civil penalties. The Voigts alleged that construction of the Coyote Creek Mine required a major source permit, rather than the minor source permit CCMC obtained, and that CCMC's coal processing plant violated the CAA because it did not include the requisite dust control plans for coal processing facilities. If the coal pile is part of the coal processing plant, as alleged by the Voigts, Subpart Y would apply to the coal pile and mandate a fugitive dust control plan. Further, a determination that the coal pile is subject to Subpart Y as part of the coal processing plant would also bring the coal pile's fugitive emissions within the PTE air pollutants threshold calculation. Thus, whether the coal pile is subject to Subpart Y is determinative of both claims.

Both parties moved for summary judgment on the question of whether Subpart Y applies to CCMC's coal pile. The district court granted CCMC's motion and denied the Voigts' motion. In a 96-page opinion and order, the district court noted that both the Voigts and CCMC provided plausible interpretations of Subpart Y that would render the coal pile a part of or separate from the coal processing plant. Because the district court concluded that both parties provided plausible interpretations, it found Subpart Y ambiguous and relied on other sources to resolve the ambiguity, including EPA guidance and the NDDOH's permitting decision regarding the construction of the Coyote Creek Mine. Giving deference to the NDDOH's permitting decision, the district court concluded that the coal pile is not

part of the coal processing plant and thus is not subject to Subpart Y. As a result, CCMC is not required to implement a fugitive dust control plan for the coal pile and the coal pile's fugitive emissions are excluded from the PTE air pollutants determination, which necessitated only a minor source permit for the Coyote Creek Mine. The Voigts appeal.

## II.

The Voigts assert that the district court erred in granting summary judgment to CCMC and in denying their motion for summary judgment because Subpart Y clearly and unambiguously includes the coal pile as part of CCMC's coal processing plant, and thus CCMC is required to obtain a major source permit and implement a fugitive dust control plan. Further, the Voigts argue that even if Subpart Y were ambiguous regarding whether the coal pile is part of the coal processing plant, the district court erred in relying on the NDDOH permitting decision to resolve the ambiguity in CCMC's favor because the NDDOH is a state agency offering an opinion on federal law that is not entitled to any deference. "We review a district court's decision on cross-motions for summary judgment de novo." Thirty and 141, L.P. v. Lowe's Home Ctrs., Inc., 565 F.3d 443, 445-46 (8th Cir. 2009). "Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law." Woods v. DaimlerChrysler Corp., 409 F.3d 984, 990 (8th Cir. 2005).

The Voigts first assert that the district court erroneously concluded that the regulations are ambiguous, arguing that the clear and unambiguous language pulls the coal pile squarely within the coal processing plant and thus Subpart Y. CCMC asserts, in response, that the regulations, coupled with unambiguous EPA guidance, conclusively demonstrate that the coal pile is not part of the coal processing plant. We agree with the district court that the regulations, standing alone, are ambiguous.

Subpart Y applies to coal processing plants, defined as "any facility (excluding underground mining operations) which prepares coal by one or more of the following processes: breaking, crushing, screening, wet or dry cleaning, and thermal drying." 40 C.F.R. § 60.251(e). But Subpart Y imposes performance standards on only "affected facilities *in* coal preparation and processing plants that process more than . . . (200 tons) of coal per day." Id. § 60.250(a) (emphasis added). Affected facilities for the purposes of Subpart Y performance standards is defined to include "[t]hermal dryers, pneumatic coal-cleaning equipment (air tables), coal processing and conveying equipment (including breakers and crushers), coal storage systems, transfer and loading systems, and *open storage piles*."[2] Id. § 60.250(d) (emphasis added). Thus, an open storage pile, defined as "any facility, including storage area, that is not enclosed that is used to store coal, including the equipment used in the loading, unloading, and conveying operations of the facility," id. § 60.251(m), is subject to Subpart Y as an affected facility where it is in the coal processing plant. However, the regulations do not define what it means for an affected facility to be "in" a coal processing plant.

The Voigts assert that the definitions of coal processing plant and open storage pile clearly demonstrate that Subpart Y broadly applies to open storage piles, regardless of their location before or after the coal crushing equipment, but the regulations simply do not provide an unambiguous answer to the inquiry here: whether a coal pile that is adjacent to the coal processing equipment, and is used for both storage and loading coal into the coal processing equipment, is "in" the coal processing plant itself. While the regulations clearly contemplate the inclusion of coal

---

[2]The parties do not dispute the application of Subpart Y to the coal processing and conveying equipment, defined as "any machinery used to reduce the size of coal or to separate coal from refuse, and the equipment used to convey coal to or remove coal and refuse from the machinery. This includes, but is not limited to, breakers, crushers, screens, and conveyor belts. Equipment located at the mine face is not considered to be part of the coal preparation and processing plant." 40 C.F.R. § 60.251(f).

piles that are within coal processing plants, they do not provide unambiguous direction as to when exactly a coal pile is "in" a coal processing plant so as to be considered an affected facility subject to Subpart Y requirements.

Because we conclude the regulations are ambiguous, we turn to subsequent interpretative guidance to aid us in determining whether the coal pile is part of the coal processing plant. See Coeur Alaska, Inc. v. Se. Alaska Conservation Council, 557 U.S. 261, 278 (2009); see also Kisor v. Wilkie, 139 S. Ct. 2400 (2019). Kisor instructs that deference to EPA guidance is appropriate where "(1) the regulation [is] genuinely ambiguous; (2) the agency's interpretation of the regulation [is] reasonable; (3) the interpretation [is] the agency's authoritative or official position; (4) the interpretation . . . in some way implicate[s] the agency's substantive expertise; and (5) the interpretation . . . reflect[s] fair and considered judgment." Wells Fargo & Co. v. United States, 957 F.3d 840, 855 (8th Cir. 2020) (Grasz, J., dissenting in part) (citing Kisor, 139 S. Ct. at 2415-18).

With respect to the dispositive issues in this case, the EPA has offered clarification on when a coal pile is considered to be "in" a coal processing plant:

> It should be noted that if the coal is unloaded for the purpose of storage, then the unloading activity is not an affected facility under NSPS Subpart Y. The coal must be directly unloaded into receiving equipment, such as a hopper, to be subject to the provisions of NSPS Subpart Y.

New Source Performance Standards (NSPS)—Applicability of Standards of Performance for Coal Preparation Plants to Coal Unloading Operations, 63 Fed. Reg. 53288-01, 53289 (Oct. 5, 1998). The EPA further stated in its responses to comments on proposed amendments to Subpart Y that it "interprets coal unloading into the first hopper 'downstream' from any form of transportation to be the beginning of the 'coal preparation plant.'" Response to Comments Received on Proposed 2009 Amendments, Standards of Performance for Coal Preparation and Processing Plants

-10-

(Subpart Y), R. Doc. 38-5, at 89; see also Standards of Performance for Coal Preparation and Processing Plants, 74 Fed. Reg. 51950-01, 51952 (Oct. 8, 2009) ("A coal preparation and processing plant begins at the first hopper (*i.e.*, drop point) used to unload coal . . . .").

The record reflects that CCMC's coal pile plays a necessary role in the process by which coal is directly unloaded into receiving equipment, or the apron feeder; however, the record also reflects that the coal pile is maintained at its size for storage purposes to allow CCMC to fulfill contractual obligations in the event of a delay or shutdown at the mine face. The coal pile is, in essence, a hybrid between a storage and unloading pile. Although the regulations and guidance do not put beyond dispute whether CCMC's coal pile is for storage—and unaffected by Subpart Y—or part of direct unloading into receiving equipment—and subject to Subpart Y—we conclude that, using the relevant interpretative guidance and other tools of construction, see Solis v. Summitt Contractors, Inc., 558 F.3d 815, 823-24 (8th Cir. 2009), the more reasonable interpretation is the one advanced by CCMC: the regulations apply only to open storage piles where the piles occur past the first hopper, which is the component into which coal is deposited in bulk and is tapered downward in smaller segments toward the crushing equipment. Because CCMC's coal pile occurs before the first hopper, it is not subject to Subpart Y. We note that the NDDOH permitting decision reached the same conclusion that Subpart Y does not apply to CCMC's coal pile. Although the NDDOH permitting decision is a useful guide in reaching our decision regarding the most reasonable interpretation of the regulations, we do not defer to the NDDOH decision nor do we rely on it as a dispositive factor in carrying out our interpretative task. See Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) ("We consider that the rulings, interpretations and opinions of the Administrator under this Act, while not controlling upon the courts by reason of their authority[,] do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."). We thus need not address the Voigts' second argument that the district court erred by affording deference to the NDDOH permitting decision.

-11-

On the record before us, we conclude that the most reasonable interpretation of the relevant regulations is that the coal pile is not "in" CCMC's coal processing plant. The district court thus did not err in granting summary judgment to CCMC on the basis that the coal pile is not subject to Subpart Y regulations, which would have required a major source permit and a fugitive dust control plan.

III.

For the foregoing reasons, we affirm the judgment of the district court.

STRAS, Circuit Judge, dissenting.

*Voigt* deference is dead and all I can say is, good riddance. *See ante* at 11. I am pleased that the court now exercises its own independent judgment to say what the law is, rather than deferring to a state agency's view, but it still misreads the regulation at the heart of this case. *See* 40 C.F.R. § 60.250(a). For the reasons stated in my original dissent, the better interpretation is that Coyote Creek's coal pile is "in" the coal-processing plant, *id.*, so the pile, just like the rest of the plant, is subject to Subpart Y, *id.* §§ 60.250–.258. *See Voigt v. Coyote Creek Mining Co.*, 980 F.3d 1191, 1206–07 (8th Cir. 2020) (Stras, J., dissenting). Alas, the court disagrees, so I must still respectfully dissent.

_____